# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| KENT KLOSTERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. CIV-05-076-E-BLW |
| vs. | ) | |
| | ) | |
| CHOICE HOTELS | ) | MEMORANDUM DECISION AND |
| INTERNATIONAL, INC., | ) | ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |

Pending before the Court is Defendant Choice Hotels International's ("Choice") Motion to Dismiss or to Stay the Action and Compel Arbitration. (Docket No. 9). Plaintiff Kent Klosterman ("Klosterman") has withdrawn Count II of the Complaint and his Motion for Preliminary Injunction. Also remaining for consideration by the Court is the vacation of the Temporary Restraining Order entered by State District Judge Monte Carlson on February 22, 2005.

Counsel for Klosterman are Cynthia Jane Woolley and Kirstin K. Fjeld of Woolley & Pogue of Ketchum. Counsel for Choice is Steven F. Schossberger of Hawley, Troxell, Ennis and Hawley of Boise. The matter was argued on May 17, 2005, and is now ready for decision.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On December 22, 2000, the parties entered into a Franchise Agreement (McGeever Aff., Ex. 1, hereinafter "M Ex.___" (Docket No. 7)).  The agreement dealt with Klosterman's agreement to build a hotel near I-84 near Heyburn, Idaho.  As applicable to this dispute, the agreement required Klosterman to begin construction within eight months of his acceptance of the Agreement.  (M Ex. 1, p.14)  Choice served a notice of default, dated September 18, 2001, asserting that Klosterman was in default under that provision (M Ex. 2) and later served notice of termination dated November 9, 2001 (M Ex. 3).

The Franchise Agreement contained an arbitration provision, which as pertinent here, provided:

> Except for our claims against you for indemnification, actions for collection of moneys owed us under this Agreement, or actions seeking to enjoin you from using the Marks in violation of this Agreement, any controversy or claim arising out of or relating to this agreement, or the breach of this Agreement, including any claim that this Agreement or any part of this Agreement is invalid, illegal, or otherwise voidable or void, as well as any claim that we violated any laws in connection with the execution or enforcement of this Agreement, will be sent to final and binding arbitration before either the American Arbitration Association or J.A.M.S./Endispute in accordance with the Commercial Arbitration Rules of the American Arbitration Association, except to the extent that those rules may be interpreted to require us to produce documents or information.  In the event more than one demand for arbitration is filed in connection with this Agreement, the demand filed with the American Arbitration Association or J.A.M.S./Endispute office having jurisdiction over Maryland proceedings

shall take precedence, and any other demand shall be withdrawn and presented in the Maryland filing. The Arbitration will apply the substantive laws of Maryland, without reference to its conflict of laws provision, except that nothing herein shall be constructed to establish independently your right to pursue claims under Maryland's Franchise Registration and Disclosure Law. Judgment on the arbitration award may be entered in any court having jurisdiction. If any party fails to appear at any properly noticed arbitration proceeding, an award may be entered against the party, notwithstanding its failure to appear. Any arbitration will be conducted at our headquarters office in Maryland.

Choice served a demand for arbitration before JAMS (M Ex. 4), dated December 31, 2003, which was received by Klosterman on January 6, 2004. The arbitrator's first pre-hearing order, dated May 13, 2004, notes that Klosterman did not participate in the telephone conference, and that he had previously told JAMS and the lawyer for Choice that he would not participate (M Ex. 6). A week later, Klosterman's Boise lawyer told JAMS that Klosterman would be represented in the arbitration by a Maryland law firm. A week later, on May 27, 2004, his Maryland lawyer told JAMS that Klosterman missed the May 13 conference because he was away and didn't get the notice. The lawyer also asked for a postponement of the arbitration hearing and for the opportunity to conduct limited discovery. (M Ex. 8)

On June 21, 2004, Klosterman served a response to Choice's demand for arbitration. The response stated several defenses, but did not challenge the

3

enforceability of the arbitration clause or the arbitrability of Choice's claims. (M Ex. 10)

On July 23, 2004, Klosterman served a request for discovery on Choice, (M Ex. 11), to which Choice responded on August 30, 2004, (M Ex. 14). Choice, in turn, served interrogatories on Klosterman on August 4, 2004 (M Ex. 12) to which Klosterman responded on August 26, 2004. (M Ex. 13)

After a couple of earlier hearing dates were continued, the arbitration hearing was set for February 22-23, 2005. (McGeever Aff. ¶ 19, hereinafter "M Aff. ¶ __" (Docket No. 7)). Both parties paid their pro rata shares of the arbitration costs assessed by JAMS, which for Choice was $8,983.71 (M Aff. ¶ 20).

At 4:30 p.m., Mountain Standard Time, on February 22, 2005, the day before the arbitration hearing was scheduled to begin in Maryland, Klosterman filed a complaint in State District Court in Cassia County, Idaho, together with a motion for temporary restraining order and preliminary injunction. At 5:30 p.m., Mountain Standard Time, the State Court entered a temporary restraining order, prohibiting Choice from continuing with the arbitration proceedings. Choice thereafter removed the case to this Court.

Choice moved to dismiss in this Court. In opposition, Klosterman filed a

4

brief and submitted his own affidavit.  Mem. in Opp'n to Dismiss and Klosterman Aff. (Docket No. 15).  In his affidavit, Klosterman states the following:

1.  He is a high school graduate, and has been a farmer all his adult life, and before.  (Klosterman Aff. ¶¶ 4-6, hereinafter "K Aff. ¶ __").

2.  He purchased some property along the highway near Heyburn, about eight years ago.  (*Id.* at ¶ 8).

3.  In the fall of 2000, he was contacted by Ed Shaw, representing Choice, who encouraged Klosterman to become a Choice franchisee. Shaw told Klosterman that if he paid an "affiliate fee" of $40,000, once the franchise agreement was signed, Choice would return $20,000 of the fee.  (*Id.* at ¶ 9).

4.  When Klosterman received the Franchise Agreement, he had not obtained financing.  When he read the "Arbitration Agreement" he did not fully understand it, and had the impression that the same rules would apply in arbitration as in a courtroom.  (*Id.* at ¶ 10).

5.  On or about December 27, 2000, Klosterman called Shaw and told him he would not sign the Franchise Agreement because he had not yet contacted a bank to find out if he could secure financing.  Shaw told him several times that the contract would not be enforced if he

5

did not obtain financing.  (*Id.* at ¶¶ 11-13).

6.     He "participated in arbitration until the arbitrator denied [him] the

opportunity to confront Ed Shaw – the representative who

fraudulently manipulated [him] into entering into the agreement – in

person during the arbitration."  (*Id.* at ¶ 22).

7.     It would have been a hardship for him and his wife to travel to

Maryland for the hearing. (*Id.* at ¶ 24).

## ANALYSIS

The Court must resolve several issues in order to decide the Motion to

Dismiss.  First, the Court needs to determine whether Idaho or Maryland law

applies to the parties' claims.  Second, the Court must decide which aspects of the

motion the Court can decide and which ones an arbitrator must hear.  Finally, the

Court must apply the given state's law to determine the resolution of the claims

which the Court can consider.

## A.     Applicable Law

"Federal courts sitting in diversity look to the law of the forum state in

making a choice of law determination."[1]  Thus, the Court applies Idaho law to

_____

[1]     *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 937 (9th Cir.
2001).

6

determine whether Idaho or Maryland law applies.

The franchise agreement contains a contractual choice of law provision stating that Maryland law applies. At oral argument, Choice cited *Ward v. Puregro*[2] for the proposition that Idaho favors contractual choice of law provisions. However, the portion of *Ward* Choice cited relies on *Cerami-Kote, Inc. v. Energywave Corp.*[3] In *Cerami-Kote*, the Idaho Supreme Court explained that in non-commercial situations:

> contracting parties may choose the law to be applied to their agreement. However, certain restrictions may limit the choice. For instance, the chosen state must bear a substantial relationship to the parties or the transaction; and the Restatement [(Second) of Conflicts of Laws § 187] advances a public policy exception similar to that of *M/S Bremen v. Zapata Off-shore Co.*[4]

The Idaho Supreme Court then held that under *Bremen*'s policy prong, that Idaho Code § 29-110 precludes the enforcement of choice of law provisions.[5] Thus, contrary to Choice's position, Idaho has a strong public policy against the

---

[2]     913 P.2d 582, 584-85 (Idaho 1996).

[3]     *Id.* at 584 (citing *Cerami-Kote, Inc. v. Energywave Corp.*, 773 P.2d 1143, 1145 n.1 (Idaho 1989)).

[4]     407 U.S. 1 (1972). *Cerami-Kote*, 773 P.2d at 1145 n.1.

[5]     *See Cerami-Kote*, 773 P.2d at 1146.

enforcement of contractual choice of law provisions.[6] This policy, as enunciated

by Idaho Code § 29-110, precludes the enforcement of the contractual choice of

law provision in the franchise agreement.[7] Thus, the Court must assess what law

applies using Idaho's conflict of laws jurisprudence.

Idaho courts follow "the most significant relationship test as set forth in the

Restatement (Second) of Conflict of Laws."[8] "The goal of this test is to identify

the state most significantly related to a particular issue and to apply its law to

resolve that issue."[9] Thus, under the most significant relationship test, "the court

first identifies various factual contacts between the transaction or parties and the

interested states.  It then evaluates these contacts in light of certain broad policy

concerns."[10]  For an issue in contract,[11] the factual contacts are:

---

[6]      *See id.*

[7]      *See id.*  The Court expresses no opinion on whether this contractual
choice of law provision will be enforceable in the arbitration proceedings.

[8]      *Seubert Excavators, Inc. v. Anderson Logging Co.*, 889 P.2d 82, 85
(Idaho 1995) (emphasis and citations removed).

[9]      *Id.*

[10]     *Id.*

[11]     Under Idaho law, a contract issue is one that involves "an action
involving interpretation of a written contract."  *Id.* at 86 (alterations omitted).
Because the claims before the Court involve interpretation of the franchise
agreement, they are contract issues.

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicile, residence, nationality, place of incorporation and
place of business of the parties.[12]

"[T]he conflicts determination is not to be made by a mechanical counting of the

contacts."[13]

The policy considerations a court is to review are:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative
interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be
applied.[14]

As it pertains to the policy considerations, "because parties to a contract are likely

to give advance thought to the legal consequences of their actions, the policies of

protecting justified expectations and increasing the predictability and uniformity

of result take on greater importance in contract cases."[15]

---

[12]    *Id.* at 85-86.

[13]    *Id.* at 86.

[14]    *Id.* at 85 n.1.

[15]    *Id.* at 86.

Thus, the Court will first look to the factual contacts.  Then the Court will evaluate these contacts in light of policy concerns, with emphasis on "the policies of protecting justified expectations and increasing the predictability and uniformity of result."[16]

As to the factual contacts, Idaho was the place of contracting as far as Klosterman was concerned.  (*See* K Aff. ¶ 15).  Choice executed the franchise agreement in Maryland.  Idaho was also the place of negotiation of the contract, to the extent any took place.  (*Id.* at ¶¶ 9-13).  Idaho was the place of performance. (*See id.* at ¶ 9).  The location of the hotel franchise was to be in Idaho.  The franchised hotel was to be built and operated near Heyburn, Idaho.  (*Id.*).  Finally, Klosterman is an Idaho resident, and Choice is a Delaware corporation, with its headquarters in Maryland.  (Am. Compl., ¶¶ 1, 2 (Docket No. 4)).  Thus, the only factual connections between Maryland and the franchise agreement are that Choice executed the agreement there and is headquartered there.

As it pertains to policy concerns, the Court agrees with Choice that selection of Idaho law may encourage forum shopping.  The Court further determines that Idaho has a strong public policy in favor of having its law enforced under the

---

[16]     *Id.*

circumstances of this case.[17]  Maryland public policy also favors the application of Idaho law in this case.[18]  The justified contract-based expectations of the parties favors the application of Maryland law.  The selection of either Idaho or Maryland law would result in a degree of certainty and predictability.  Finally, it is generally easier for a court to apply the law of the forum state, but it is not unusual to apply the law of another state.

After considering the factual contacts in light of the above-mentioned policy concerns, the Court concludes that Idaho law should apply to the claims that the Court may reach.  The Court will now determine which claims are proper for the Court to resolve.

**B.     The Claims the Court may Reach**

Klosterman contends that the arbitration clause does not apply to Choice's liquidated damages claim and that the arbitration clause is unenforceable.  The unenforceability argument rests on Klosterman's claim that the contract and the

---

[17]      *See Barber v. State Farm Mut. Auto. Ins. Co.*, 931 P.2d 1195, 1200 (Idaho 1997) (stating that "Idaho has an interest in applying its law to contracts performed within this state").

[18]      *See Am. Motorists Ins. Co. v. Artra Group, Inc.*, 659 A.2d 1295 (Md. 1995) (explaining doctrines of lex loci contractus and renvoi).

11

arbitration clause are unconscionable.[19]  Choice contends that Klosterman waived his current claims concerning the arbitration provision by actively participating in the arbitration proceedings in Maryland for more than a year.

The Ninth Circuit recently set out the types of claims regarding an arbitration agreement that a district court may hear.  In *Nagrampa v. Mailcoups, Inc*, the court explained that "'a federal court may consider only issues relating to the making and performance of the agreement to arbitrate' when deciding whether a party is bound by an arbitration clause; matters that concern the larger agreement of which the arbitration clause is a part must be resolved by an arbitrator."[20]  Thus, the Court may only reach those issues that pertain to the making and performance of the arbitration clause.  Accordingly, the Court can reach Klosterman's argument that the arbitration clause is unconscionable, but not arguments regarding the unconscionability of the franchise agreement.

As to the remaining claims regarding the coverage of the arbitration

---

[19]     At oral argument, Klosterman also argued that fraud in the inducement precluded enforcement of the contract.  This claim was not raised in Klosterman's Mem. in Opp'n to Dismiss  (Docket No. 15).  However, even if this claim has been properly presented to the Court, as discussed below, because it is a challenge to the contract as a whole and not the arbitration clause, this claim must be decided by the arbitrator.

[20]     401 F.3d 1024, 1028 (9th Cir. 2005) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967)).

agreement and waiver, the United States Supreme Court recently stated that "the decision of what to submit to the arbitrator is a matter of contractual agreement by the parties, and the interpretation of that contract is for the court, not the arbitrator."[21] Thus, this Court may decide the argument over the scope of the arbitration provision.

The Supreme Court has also stated that "'allegations of waiver, delay, or a like defense to arbitrability' . . . are questions for the arbitrator."[22] Choice's waiver argument in this case is not a defense to arbitrability, but rather a defense to Klosterman's unconscionability argument. Thus, this Court may decide the waiver argument to the extent it applies to the unconscionability of the arbitration provision itself.[23] Accordingly, the Court will now address Klosterman's scope and unconscionability arguments and Choice's waiver argument under Idaho law.

## C.    Scope and Enforceability

### i.    Scope

Klosterman contends that the arbitration clause does not apply to Choice's claim for liquidated damages.  The arbitration clause covers "any controversy or

---

[21]    *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 456 (2003).

[22]    *Id.* at 457.

[23]    *See Nagrampa*, 401 F.3d at 1028.

13

claim arising out of or relating to this agreement, or the breach of this agreement." The arbitration clause exempts "actions for collection of moneys owed [Choice] under th[e] Agreement." Thus, the Court must decide whether Choice's claim for liquidated damages arises out of or relates to the breach of the agreement, and, if so, whether the claim is exempted from coverage as "moneys owed."

Idaho construes "any controversy or claim" language very broadly.[24] Because Choice's claim is for liquidated damages caused by Klosterman's alleged breach of contract, the Court concludes that the arbitration clause covers this claim. Such a claim certainly falls within the "any controversy or claim arising out of . . . the breach of this agreement." Accordingly, Choice's liquidated damages claim is subject to arbitrability as long as liquidated damages are not "moneys owed" under the franchise agreement.

In *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*,[25] the Fourth Circuit faced this precise question. The *BSR* court determined that "the collection exemption applies to actions by Choice to enforce specific payment obligations that are 'fixed' by the Agreement and not contingent on additional events."[26] The

---

[24]   *See Lovey v. Blueshield of Idaho*, 72 P.3d 877, 885-88 (Idaho 2003).

[25]   252 F.3d 707 (4th Cir. 2001).

[26]   *Id.* at 710.

14

court went on to conclude that because a liquidated damages claim arises from a breach of contract, the collection exemption did not apply.[27]  The Court finds this reasoning persuasive and consistent with Idaho's public policy favoring a broad reading of arbitration clauses[28] and arbitrability in general.[29]  Accordingly, Choice's claim for liquidated damages falls within the scope of the arbitration agreement and is therefore subject to arbitration.

### ii.    Waiver

Choice contends that Klosterman waived his current claims concerning the arbitration provision by actively participating in the arbitration proceedings in Maryland for more than a year.  The Court agrees.

In *Cady v. Allstate Ins. Co.*,[30] Cady made a claim under the uninsured motorist provision of her insurance policy.  Cady sued Allstate in state court and Allstate demanded arbitration.  Cady did not object to the arbitration prior to its conclusion, but asked the state court to set aside the arbitrator's decision.  In

---

[27]    *Id.* at 712.

[28]    *See Lovey*, 72 P.3d 885-88.

[29]    *Hansen v. State Farm Mut. Ins. Co.*, 735 P.2d 974, 981 (Idaho 1987) (stating that "the legislature has expressly declared that public policy favors arbitration provisions in written contracts").

[30]    747 P.2d 76 (Idaho Ct. App. 1987).

15

finding that Cady waived her arbitrability challenge, the Idaho Court of Appeals noted that Cady did not oppose the demand for arbitration. "Apparently, she participated fully in the arbitration proceeding. The general rule is that participation in an arbitration hearing on the merits is a waiver of the right to raise the issue of arbitrability, unless preserved by a timely objection before a hearing on the merits."[31]

In support of its rationale, the court of appeals cited, inter alia, *Participation in Arbitration Proceedings as Waiver of Objections to Arbitrability*, 33 A.L.R.3d 1242 (1970).[32] The general rule as stated in 56 A.L.R.5th, which superseded 33 A.L.R.3d 1242, is as follows:

> As a general rule, participation in an arbitration proceeding on the merits of a dispute will result in a waiver of the right to raise the use of arbitrability.... A party to an arbitration proceeding may preserve this right to make an objection to arbitrability by making a timely objection to arbitrability.[33]

It should be noted that Klosterman did not raise any objection to arbitration up to the point where he filed his response to Choice's demand, nor thereafter until the day before the arbitration hearing was to commence. Thus, although

---

[31]     *Id.* at 78.

[32]     *Id.*

[33]     56 A.L.R.5th 1242, § 2 (2004).

Klosterman did not participate in an arbitration hearing "on the merits" like Cady, he still participated in arbitration proceedings for over a year. Klosterman's participation is analogous to conduct that the Idaho Supreme Court found to constitute waiver in *Hansen v. State Farm Mut. Auto. Ins. Co.*[34]

In *Hansen*, State Farm had actively participated in proceedings in State district court concerning coverage under the uninsured motorists provision of Hansen's policy with State Farm. State Farm waited until eleven months had elapsed before demanding arbitration. The demand came several months prior to the scheduled trial date. The court said: "We hold that State Farm's motion to compel arbitration was untimely filed and that by submitting to the jurisdiction of the district court and proceeding with litigation in that court, State Farm waived its right to compel arbitration."[35] Thus, the Court concludes that the Idaho Supreme Court would hold that Klosterman has waived his arguments challenging the validity of the arbitration clause. Accordingly, the Court must grant Choice's motion to dismiss.

### iii.    Unconscionability

The Court notes that even if Klosterman had not waived his

---

[34]    735 P.2d 974.

[35]    *Id*. at 981.

17

unconscionability challenge, such challenge would be unsuccessful. In Idaho, a

contract clause will be unconscionable only if it is both procedurally and

substantively unconscionable.[36] The Idaho Supreme Court has explained that lack

of voluntariness and lack of knowledge are "[i]ndicators of procedural

unconscionability."[37] Unfair surprise "from ambiguity, the use of inconspicuous

print, or complex legalistic language, can [also] cause a party to be uninformed

about the terms of the contract and is a factor that can establish procedural

unconscionability."[38]

Klosterman argues that the arbitration clause is procedurally unconscionable

because he lacked voluntariness and knowledge (Mem. in Opp'n at 10), and due to

unfair surprise. (*Id*. at 12). As it pertains to lack of voluntariness and knowledge,

Klosterman argues:

> When Mr. Klosterman told Mr. Shaw that he could not sign the
> Agreement because he did not know whether he could secure
> financing, Shaw coerced him into signing the Agreement by assuring
> him that Choice would not enforce its liquidated damages clause.
> Also, Choice used high pressure tactics by asserting that if Mr.
> Klosterman did not sign by December 31, 2000, he would not be
> entitled to Choice's special that refunded $20,000 of Mr.

---

[36]     *Lovey*, 72 P.3d at 882.

[37]     *Id*.

[38]     *Id*. at 883 n.2.

18

> Klosterman's Affiliate Fee.  Choice allowed Mr. Klosterman little
> time to accept the agreement.  Moreover, Choice misled Mr.
> Klosterman to believe that they would not enforce the contract if he
> did not secure financing.

(*Id*. at 10-11).  The principal problem with Klosterman's argument is that it

addresses the contract as a whole, not the arbitration clause itself.  Accordingly,

Klosterman has not raised any arguments that the Court may consider regarding

whether the arbitration clause is procedurally unconscionable due to lack of

knowledge or voluntariness.

As to unfair surprise, Klosterman argues that the arbitration clause was

printed on page 13 of 15 and that "the existence of the arbitration clause was never

pointed out or explained to him."  (*Id*. at 12).  In addressing similar objections to

an arbitration clause in an insurance contract, the Idaho Supreme Court has stated

that a contracting party's "failure to offer unsolicited explanations to the various

provisions in its . . . contract is not a factor indicating procedural

unconscionability."[39]  The Idaho Supreme Court has also held that an arbitration

clause does not need to appear on a particular page of a contract and that where

"[a]ll of the terms . . . were printed in the same font size[, and e]ach provision was

separately numbered, titled, and set off by spacing from the preceding and

---

[39]     *Id*. at 884.

following provisions," that an arbitration clause is not hidden.[40]

The Court finds that the same font size was used in each provision of the franchise agreement.  The Court also finds that each provision was separately numbered, titled, and set off by spaces from the preceding and following provisions.  Accordingly, although the arbitration clause is located on page thirteen of a fifteen page agreement, the arbitration clause was not hidden.  Thus, the arbitration clause is not procedurally unconscionable based on unfair surprise. The motion to dismiss must be granted.

For the foregoing reasons, the Motion to Dismiss (Docket No. 9) is GRANTED.  The Temporary Restraining Order entered by the State District Court is VACATED.

This action is DISMISSED with prejudice.

DATED:  **May 18, 2005**

Honorable Thomas G. Nelson
United States Circuit Judge
Sitting by Designation

---

[40]    *Id.*